(33 South. 112.)

No. 14,327.

TAYLOR et al. v. MARTIN.

(Dec. 1, 1902.)

BROKERAGE CONTRACT—CONTINUATION— COMPENSATION.

1. Where no time for the continuance of a contract of brokerage is fixed, either party is at liberty to terminate it at will, subject only to the ordinary requirements of good faith.

2. The broker, in order to be entitled to his commission, must prove his authority to act, and that he was the procuring cause of the transaction.

(Syllabus by the Court.)

Appeal from civil district court, parish of Orleans; George H. Théard, Judge.

Action by William R. Taylor and others against Francis Martin. From a judgment for defendant, plaintiffs appeal. Affirmed.

Charles Louque and F. Rivers Richardson, for appellants. Farrar, Jonas & Kruttschnitt and Frank N. Butler, for appellee.

MONROE, J. William R. Taylor, Alfred Delavigne, and Arthur Hauch sue Francis Martin, alleging that he placed a sawmill and certain timber lands in the hands of Taylor for sale at $100,000, on a commission of 10 per cent.; that Taylor secured the services of Delavigne and Hauch, who obtained a purchaser, to whom Martin eventually sold the land at the price fixed; and that he therefore owes the commission; and they pray for judgment for $10,000. The answer is a general denial. The case is before this court on appeal from a judgment rejecting the plaintiffs' demand. The facts, as we find them established by the evidence, are as follows: In October, 1899, Taylor wrote to Martin & Dreibholz, a firm of which the defendant was a member: "I understand that you are the owners of the Crescent Sawmill, at Bayou des Allemands, and are desirous of selling the same. If this is correct, please favor me at once with full specifications of the machinery. * * * I have several clients wanting outfits of 25,000 to 30,000 feet capacity, and can place it for you, provided I can buy cheap for cash. * * *"

This letter was returned to Taylor by Martin, who alone owned the property referred to, with the following memorandum on it, to wit:

"Mill is located at des Allemands, 32 miles from N. O. 2-story building, 40x140. Circular top and bottom saws. Capacity about 40 M feet per day. Machinery made by Stearms Mfg. Co., of Erie, Penn. About eight or nine thousand arpents of cypress timber lands go with the mill."

And it was agreed that Taylor might offer the property thus described on terms that would bring $75,000, net, to Martin, which agreement was subsequently modified to the extent that the price was raised to $100,000,

upon which Taylor was to receive a commission of 10 per cent. Taylor thereupon made some efforts to find a purchaser, and in January or February, 1900, introduced to Martin a Mr. Caldwell, who looked at the property, but declined to buy. He afterwards met Martin, and, being asked if he had done anything, answered, "No," but told Martin that Mr. Delavigne, coplaintiff herein, would come to see him, and that he (Martin) could trade with him as he would with him (Taylor), as there was several of them working together. He accordingly, some time later, gave Delavigne a letter of introduction to Martin, which Delavigne subsequently presented. In the meanwhile (that is to say, before calling on Martin, and perhaps before he received the letter) Delavigne spoke to Hauch, the other coplaintiff, and the latter upon May 12, 1900, wrote to T. Gordon Reddy, agent of the Cameron Estate, as follows: "I offer to sale [?] you 9,000 acres at Bayou des Allemands, with a mill almost new, to cut about 30,000 feet per day,—said land holds ninety to one hundred million feet, 10 to 11,000 feet to the acre, —for $100,000. * * *" Upon the same day that this letter was written, but whether before or after does not appear, Delavigne called upon Martin, and, presenting the letter of introduction from Taylor, had a conversation with him, the purport of which will be given a little later. Martin, it seems, as far back as January, 1898, had received a letter from William Cameron, in which, referring to certain of the lands for which plaintiffs are here claiming to have found that gentleman's estate as a purchaser, he said: "You own, with myself, one-half of section 4. Please let me know what you ask for the same, or whether you want to divide. * * *"

And he received other letters from Cameron on the same subject. Thereafter Cameron died, Martin became the sole owner of the tract referred to, and the correspondence looking to its sale and to the sale of his other lands to the Cameron estate was continued between T. Gordon Reddy, representing that estate, and Martin, until late in 1899, but without definite results. In April, 1900, Martin instituted a suit, claiming that the representatives of the Cameron estate were trespassing upon the tract known as "Section 4," containing 1,600 arpents, and praying that they be enjoined from so doing, and that the estate be condemned to pay $50,000, as the value of the timber already taken; and the suit so begun was pending, and its management was in the hands of his attorneys to prosecute or compromise, upon May 12, 1900. When, therefore, upon that day, Delavigne, presenting to Martin his letter of introduction from Taylor, gave the latter to understand that he had clients who wanted to buy cypress lands, and asked for authority to offer those which Martin had for sale, the latter asked him who his clients were, and, upon Delavigne's declining to give their names, said to him: "If Mr. Gordon T. Reddy is one of your purchasers, he is the party who is representing the people whom I have a suit against, and I have been cautioned by my attorney not to put a price on lot 4,—especially lot 4,—because that is the tract of land on which the timber was cut, * * * and I can't give you any authority to sell that." Delavigne then admitted that Reddy was one of the purchasers whom he had in view, and endeavored, without success, to persuade Martin that it would be to his interest to negotiate with Reddy through others than his attorneys, and thereby sell his property and settle the lawsuit at one and the same time. Subsequently, on May 17th, Delavigne again called on Martin, and, whilst in his office, invited Hauch, who seems to have been near by, to come in; but Martin declined to talk, save in the presence of his attorneys, and made an appointment to meet the two gentlemen in his attorneys' office upon the following day. At the time and place appointed, Mr. Hauch being the first to appear, there was some conversation between him and Mr. Butler, one of the attorneys referred to, in which the latter was informed that Hauch had been negotiating with Reddy with reference to the sale of the property, whereupon he immediately, and in Hauch's presence, dictated to Reddy a letter, which was duly mailed, reading as follows:

"On April 12th last [should have been May 12th], one Arthur Hauch, of this city, wrote you, as you may remember, relative to the sale of land of Captain Martin, in the parish of Lafourche. Mr. Hauch also saw you in reference to said matter this morning. I wish you to understand that Mr. Hauch is without any authority to represent Captain Martin in this matter in any way, shape, or form, and

whatever overtures he may have made to you, relative to or suggesting a compromise, settlement, or sale, or otherwise, of any property belonging to Captain Martin, or in relation to a settlement of the litigation now pending between the heirs of Cameron and Captain Martin, was done of his own volition, and without Captain Martin's direction, knowledge, authorization, or consent."

Martin and Delavigne came in later, and there was a conversation in which Martin distinctly denied that Delavigne and Hauch had ever been authorized to represent him, and refused to confer such authority on them. After which, and lest Taylor should revive his interest in the matter, Martin looked that gentleman up, and formally withdrew the authority which had been conferred upon him. In the interview in which this took place, accepting, as we do, Martin's version of it, Taylor was asked whether he had ever authorized Delavigne or Hauch to sell Martin's property, and he answered that he had not.

It is shown that Delavigne had in his possession a typewritten list of the lands owned by Martin, which the latter was originally offering for sale with the mill. Where Delavigne got this list, he was unable to say. He thought that he must have obtained it from Martin, but Martin states positively that such was not the case, whilst Taylor states that it was not furnished by him. However that may be, it is quite certain that the list included several tracts, aggregating about 2,200 acres, and among them lot 4, the subject of the litigation with the Cameron estate, which, according to the memoranda on its face, and by his own admissions, had been withdrawn, and which Delavigne was without authority to sell.

After the interviews of May 18th between Martin and the other litigants, Martin's attorneys and Reddy (the latter as the representative of the Cameron estate) came together, and Reddy was given a 90-day option upon a list of lands which included the 1,600 arpents in lot 4; and upon November 5, 1900, this option was waived, and the lands thus listed were sold to R. H. Downman, one of the Cameron heirs, by an act in which the pending suit against the estate was also disposed of; the entire consideration received by Martin being $100,000.

It is not pretended that either Taylor or Delavigne ever had any personal dealings with Reddy concerning the business here in question, and it appears that Hauch first approached him on the subject by means of the letter of May 12, 1900, heretofore mentioned, which merely offered certain property, without identifying it. Reddy died in the early part of 1900, and it was only after his death, in March of that year, that this suit was brought.

It seems clear from all this that Taylor never undertook to substitute Delavigne for himself, as Martin's broker, without Martin's knowledge or consent, or to confer on him the authority with which he (Taylor) had been vested by Martin; else why did he give him a letter of introduction to Martin, and tell the latter that he could trade with him, etc., and why should Delavigne have presented his letter to, and have asked that such authority be conferred on him by, Martin? But even if Taylor could have delegated to Delavigne the authority with respect to Martin's affairs which had been conferred upon him, and had done so, or, better still, if he, himself, upon May 12, 1900, had written to Reddy the letter which was written by Hauch of whom neither he nor Martin had ever heard, and, upon the same day, whether before or after writing, had been informed by Martin that the name of Reddy, coming from him, would not be considered, he would have had no right to complain; and still less right, if possible, have Delavigne and Hauch. For Reddy had not been heard from, and had not, in all probability, received the letter; and there was nothing in the situation to prevent Martin from putting a stop to further negotiations with him, whether through Taylor or any one else, and whether with reason or without, since, assuming the offer contained in the letter to have referred to his land, and to have been binding, as an offer, upon the party by whom it was made, it included land which Martin had not authorized any one to sell; and in any event, as matters then stood, he had the right to withdraw it, or to require it to be withdrawn, and the latter is substantially what was done by him at the time, whilst the former is exactly what was done by his attorney upon May 18th, when that gentleman was informed that the letter had been written.

Aside from this, the evidence fails to show that Hauch's intermeddling had any influence on the result. It did not establish the relations between Martin and Reddy, or between Martin and the heirs of Cameron, which led to the sale of the property. Those relations had been established long before Taylor had been employed or Hauch had been heard of; and, conceding to the plaintiffs all the authority that they claim, that authority would not have enabled them to make the sale which was made, for the reason that the property sold included the 1,600 arpents which were in litigation, which they were not authorized to sell, and without which the sale could not have been made, and the sale carried with it the settlement of a lawsuit which they were not authorized to settle, and the settlement of which was also a necessary condition of the sale.

The following propositions of law relied on by counsel for defendant, and applicable to the facts of the case, are well sustained by reason and authority, to wit:

"Where no time for the continuance of a contract of brokerage is fixed, either party is at liberty to terminate it at will, subject only to the ordinary requirements of good faith." Sibbald v. Iron Works, 83 N. Y. 378, 38 Am. Rep. 441; Simpson v. Carson (Or.) 8 Pac. 325; Neal v. Lehman (Tex. Civ. App.) 34 S. W. 153; Blodgett v. Railroad Co. (Iowa) 19 N. W. 799; 4 Am. & Eng. Enc. Law (2d Ed.) p. 967.

"The broker, in order to be entitled to his commission, must have been the procuring cause of the transaction. He cannot recover unless he proves his authority to act, and that he was the procuring agency in effecting the sale." 4 Am. & Eng. Enc. Law (2d Ed.) pp. 977, 970.

The judgment appealed from is therefore affirmed.